Good morning, Your Honors. My name is James Nguyen from Foley & Lardner, and I represent the appellant in this case, Kymsta Corporation. Your Honors, it's important to understand that while this case is framed in the context of a trademark battle between my client and Quiksilver Corporation, it's really about the efforts of a large global corporation, Quiksilver, which we all know is the famous beachwear, swimwear maker, to really try and stifle competition from a very small competitor, my client, Kymsta, which makes women's clothing. It's a small, in the scheme of the apparel industry, a relatively small company. And Kymsta, despite the expense, invests a lot of time and effort to try and defend itself in this litigation to have its day before the jury. The district court robbed my client of its right to a jury trial when it decided a number of issues, including one major issue before the trial even began, and a number of issues on Quiksilver's motion for judgment as a matter of law. We believe that the judgment should be reversed for several reasons. One, because the district court erred in granting Quiksilver's Rule 50A motion at the end of the defense case that I put on at trial on a variety of issues, including trademark priority and the issue of Kymsta's affirmative defenses. Two, because some of the evidence we believed was so overwhelmingly in my client's favor that the court should have granted our own Rule 50A motion in Kymsta's favor. And finally, assuming that the district court was correct on the merits, the terms of the actual injunction that it issued and that Quiksilver tried to sneak in at the last minute after the trial court had already ruled are unreasonable and stifle my client's ability to compete fairly in the business market. It's important to remember that the standard review that applies here on a motion for judgment as a matter of law is de novo. So if this court finds that there is a basis in its opinion for the questions to have gone to the jury, then it should reverse and remand the case for retrial. Let's take a look at the very first issue, which is tacking. This is a very important issue because the whole chronology of this case deals with whether or not Quiksilver and its Quiksilver Roxy composite mark predates my client's Roxy wear mark and then also has some relationship to Quiksilver's standalone Roxy mark. Let me take a look to show the court some of the exhibits that were introduced into evidence. This is a very visual case, so it's important for the court to understand. The very original swimsuits that were sold by Quiksilver had Quiksilver imprinted on the fabric. I'm pointing to the imprint that's in a picture that's at excerpt from Record 47. There's a poster that has a picture of a woman jumping up and down in a swimsuit. This is one of the original swimsuits, and it has Quiksilver emblazoned in the imprint as well. No Roxy yet. No Roxy yet. Next, let me turn to the spring-summer 1991 season. This is the very first season of Quiksilver's Jr.'s line. The exterior strip label and the interior label that's affixed to the swimsuit say Quiksilver, and only Quiksilver. No Roxy anywhere. And, Your Honors, I have the swimsuits here that were introduced into evidence if the court would like to look at them. Now let's get to the hang tags that were affixed to the, that were tapped onto the swimsuits. They have this design, including this logo, which also appeared on a poster. And this is one of the key issues in the case. It has Quiksilver on the left and Roxy on the right. The testimony from the original designer of the whole Jr.'s line, Jill Williams Dodd, is that she never was going to use Roxy by itself when the line was introduced because no one would have known who Roxy was. At the time, the company was trading upon the great fame and value of the famous Quiksilver brand. And her testimony is that this was the Quiksilver Roxy mark. I'm sorry. No, go ahead. At first, obviously, when they start with Roxy, no one's heard of Roxy because they just invented it. But at some point, people start hearing of Roxy. Absolutely, Your Honor. We don't dispute that. And, in fact, we believe when that happened is about 1995 or 1996 when the company first began doing mass consumer advertising by taking out ads in Seventeen magazine and a variety of the different female-oriented magazines. Let me ask you a question before we leave the hang tag. If Roxy had a stand-alone connotation adequate to make it protectable, would the fact that it's on the hang tag make a difference in your mind? No, Your Honor. The question is whether it has, at this time, independent trademark significance. At most, this could be a product mark being co-branded with a house mark. But the law is very clear, and I think both sides agree, that for a product mark to have some trademark value, it has to be independently significant from the house mark, in this case, Quicksilver. And the evidence was very clear from witnesses on both sides that at the time this was introduced, no one knew who Roxy was, and they used the Quicksilver brand to take advantage of the notoriety of Quicksilver so that people knew the product was coming from Quicksilver, not from Roxy. I think the district court placed a lot of significance on the fact that the fonts are different, the typeface is different, they're physically separated, even though they're both there. What would you say about that? Your Honor, that is correct. I mean, certainly that's undisputable. It's there on the graphics. What I would say there, Your Honor, is that even though the fonts are different, it's still a composite mark, mainly because at the time, you could not prove that Roxy, even if it's in red and a different, separated from the Quicksilver, had any independent trademark significance from the Quicksilver. It was not being marketed as only a Roxy line. All of the attempts to sell it were Quicksilver Roxy. There's a number of documents in the record in which Quicksilver itself referred to the label as, quote, Quicksilver Roxy, unquote. And so, therefore, particularly with the testimony of Ms. Dodd, that this, in her mind, was the Quicksilver Roxy composite mark, I think that at least created a jury question for the jury to determine whether or not this was a composite mark, or whether or not it was an attempt to use the standalone Roxy name. Now, Your Honor, it's important to note that if this hang tag could only have the red Roxy by itself, we would not be disputing anything today. We would conceive that would be a use of Roxy, but that's not what happened. And in the 1992 season, the very same strip and interior labels were used that only said Quicksilver. The hang tag changed now to this design, which says Quicksilver on top and then Roxy in a slightly different, in sort of a curious font. And again, in our minds, this is even a closer use of the composite Quicksilver Roxy mark. It is using the two words together, definitely has Quicksilver in a different font because that is the Quicksilver font used for the men's line, and it's using Roxy in a composite manner. The key question, Your Honors, is that there are two different trademark registrations that Quicksilver has, one for a Quicksilver Roxy phrase and another for just Roxy by itself, both in the same product class for clothing. One of the questions which was never answered at trial and which should have gone to the jury is, if these are not the Quicksilver Roxy composite mark, what were? There was no other evidence introduced at trial of a product, of a hang tag, of a label which showed Quicksilver and Roxy together. Quicksilver registered its Quicksilver Roxy composite mark first, and it admittedly did so because there was other uses of Roxy floating out there, and it believed that it had a better chance of getting through the Patent and Trademark Office if it registered Quicksilver Roxy the composite mark. What was that date for the registration of Quicksilver Roxy? Your Honors, I believe it was registered in about 1998. Let's see. I think the, yeah. 1996. 1996, that's correct, Your Honor. The second Roxy, the second mark, Roxy by itself was 1998. It was 1996. That is many, many years after this whole process started, and that suggests that the Quicksilver Roxy name and the Roxy standalone name didn't take off until the mid to late 1990s. I elicited testimony from Mr. McKnight, the CEO of Quicksilver, in which he acknowledged the reason they didn't register the marks earlier is they were just testing the waters to see if the Roxy name was going to take hold, and only once they felt that it took hold, and that's when they started mass advertising in 1995 or 1996, that it was independently significant from a trademark perspective. There's also testimony from Randy Hill that was presented at trial, and he was brought into the company to help run the women's line from another women's swimwear company. He joined in fall of 1993, well after my client entered the market with its Roxyware name, and he said he was the one who made the decision to treat Roxy as a standalone brand. Based upon that and the considerable testimony from Ms. Dodd, we believe it was a clear error for the district court to rule, certainly before trial even started and after the completion of evidence, that these two marks are equivalent for tacking purposes. But, Counsel, in the trademark applications, the representations were made that these marks were used as early as January 1992. Correct. And January 1st, 1992 in the case of the second one. That's correct, Your Honor, which leads to another issue, which is what standard of proof is Quicksilver held to? Because it is now trying to go back earlier in time than the dates in which it stated in its trademark applications. It wants to prove first use in 1990 or 1991. Well, perhaps so. But in order to prevail, it only has to get behind a mid-January date. Correct. That's correct, Your Honor. I don't think we get to clear and convincing because all they need to prove to get behind that is somewhere between January 1st and January 15th. And in the case of Roxy, they said January 1st, not the end of January. Right. So I don't see where they do have to swear behind their registration date. Well, Your Honor, we think they need to at least do that for the Quicksilver Roxy composite mark. No, because you concede that. I'm sorry, Your Honor? You concede that they go behind their swear date on Quicksilver Roxy. That's true, Your Honor. We concede the date. One of the things we don't concede is what was the actual use of Quicksilver Roxy. And that's one of the questions that came up at trial, which is, well, what is the use? Give us a sample of when you first used the Quicksilver Roxy mark. They are claiming that these uses I have shown you, particularly on the hang tags, are of the Roxy standalone mark, not of the Quicksilver Roxy composite mark. I believe that Quicksilver should be held to the higher burden of proof to at least show what the actual mark is. And what's your argument that they should be held to the higher burden of proof for the Roxy mark? Or do you not argue it for the Roxy mark? Yes, I do, Your Honor. And that's because the cases in which we cited do not limit the higher standard of proof to instances in which the defendant in this case, my client, Kimsta, is trying to prove a first-use date that's earlier than that stated in the trademark applications of the plaintiff. The rationale is the change in position. Right. But they don't have to prove that it was earlier than the claimed date because they can win if they only prove that it happened on January 2nd. That's true, Your Honor. If it happened on December 31st. We do agree with that, Your Honor. Let me turn to another question, which is the ---- Would you mind? I do have one other area that I'm particularly concerned about, and I'm worried that you won't get to it. Okay. I hate to interrupt your organizational flow, but I'm concerned about whether Roxy is inherently distinctive or whether you had any evidence that Roxy was inherently distinctive in the light of Lane and what that evidence would be, how you ---- what you would have to show and what you did show to show that Roxy was primarily viewed as a woman's name as opposed to anything else. Right, Your Honor. That's a very important point. We believe that even if Roxy was used by itself before my client entered the market, it did not have secondary meaning at that time. This is the evidence we showed that ---- Well, whether it had to. We don't know whether it had to. Okay. Your Honor, this is the evidence we introduced to show that Roxy is a personal name. One, Mr. Danny Kwok, who's the person who selected the name. But you have to prove that it's primarily a personal name in the eyes of the consuming public. That's what the other side says. You have to show that. That's true, Your Honor, although the case of Lane Capital Management is a little different. That dealt with surnames. And the reason there's a distinction is that a lot of surnames are words, as that is another example the court gave. Roxy is a primary name, a first name. And there was no dispute at trial or no evidence introduced that people view Roxy as some other meaning other than being a name. Other meanings, but there are other uses, specifically the L.A. Club and movie theaters. Yes, Your Honor. That is correct. This is the evidence that was ---- How do you distinguish Lane in that light? Well, Your Honor, I think that even though there are other uses of Roxy, Lane only dealt with a situation where surnames were words or terms that have other meaning in the English language. And so I don't think it really bears on the question of the first name that's used here, Roxy, and whether that might be used in some other fashions or context. Irrespective of that, we believe that there was sufficient evidence introduced to send this issue to the jury. One, Danny Kwok, who's the person who selected the name, he admitted that it's a female name. There was evidence that the daughters of the CEO and Australian founder of Quicksilver were named Roxy, and it was promoted by Quicksilver as being their names. Quicksilver's own outline history, which is in our supplemental excerpts of record at 82, states that Roxy was the name of the daughters. We introduced the promotional videotape from Quicksilver in which Mr. McKnight himself is saying that the reason the name was chosen was it was a reference to Roxy, his daughter, and the other Roxy daughter. And Ms. Heffner herself testified that it was her nickname for a number of years. And so we believe there was sufficient evidence introduced at trial to show that this was a name. Now, Quicksilver's taking the position, well, we didn't portray it to the public as a name or not anyone's specific name, that it was just sort of this mythical girl, this mythical, you know, Roxy identity. Well, I gather what they're asking for is a consumer survey showing that most That's correct, Your Honor. And that is not evidence that we introduced at trial. We did it mainly through soliciting these admissions from their various witnesses that it was a name, they knew it was a name when they chose it as the brand for this junior's line, and that a number of people acknowledged that it was a female name. Is this a question of fact, inherent distinctiveness and whether it's primarily a name? Is that a question of fact? I think, Your Honor, that can be a question of fact. Ultimately, the question of what classification the mark is will ultimately be a legal question, but the evidence that leads up to that determination is a factual question. Because there was evidence that this was a name, we believe that the court should have required KMSTA to provide evidence that its Roxy mark had acquired secondary meaning. And the key point in time is... You mean Quicksilver. Excuse me. You're right, Quicksilver. The key point in time is when my client entered the market. It had to have acquired, with the Roxy mark, secondary meaning by mid-January of 1992. I think it is hard press for Quicksilver, given the evidence, to show that within a year, barely, of its introduction of this composite mark, that Roxy by itself had acquired any secondary meaning. It had done no consumer advertising until 1995 or 1996, and there was no effort to make Roxy a standalone mark until Mr. Hill joined the company in 1993. And because of that, we believe the court below erred on the secondary meaning finding. We only need secondary meaning if we have inherent distinctiveness. That's correct, Your Honor. If it's not inherently distinctive, then you need to prove secondary meaning. On the defenses, Your Honor, I won't take up too much time. We believe that we introduced sufficient evidence to send the question of the fraud defense and the innocent use defense to the jury. I want to focus my remaining time on the terms of the injunction that were issued. Can I take two minutes for rebuttal? Sure, Your Honor. I'll take two minutes for rebuttal. You've got one minute. Sure. Let me address very quickly the terms of the injunction. Paragraph 6G. It's an injunction essentially on a copyright issue that was not brought into the complaint. It's never pled or alleged in the case, and we think that exceeded the court's authorization. That should be reviewed de novo. The rest of the injunction terms should be reviewed for abuse of discretion. The main issue is paragraph 6D. It limits Kempstead to placing the Roxywear label that it uses only on the interior of its clothing. It's very common in the apparel industry to have hang tags and other badging and other tags that are affixed to the outside of a garment. This is inconsistent with the district court's ruling that my client can sell to any customer in the world it wants. What if one day a customer says, I want hang tags, and Kempstead is then left to say, well, I can't sell you because I'm enjoying from even attaching a hang tag that says Roxywear by Roxanne Heppner to my clothing. All right. Thank you, Your Honor. If you wouldn't mind, on the posters, I'm unclear about the chronology of the posters. If you could show us which is the 1990 poster and which is the post-February 92 poster. All right. May it please the Court. My name is Mike Yoder. I represent the respondent, Quicksilver. Let me start out by saying, Your Honors, that the district court's result was not only right. It was just and fair because the evidence was uncontradicted at trial that Quicksilver did exactly what the owner of a trademark should do. It displayed it on the product prominently. It imprinted it on the product. It used hang tags. It had posters, signage. It promoted its mark. It made it a brand. Well, you're begging the question of which mark, the Quicksilver Roxy mark or the Roxy standalone? Roxy, Your Honor. Roxy. Roxy standalone? Yes, and it's famous. Roxy is a famous mark now, which is what Kempsta has conceded in its reply brief as well, although it wasn't required to be famous in 1991 to establish first use. That's not a requirement of trademark law. Quicksilver also advertised its mark over the years, and it obtained registrations for its mark. But, counsel, the problem I have is determining when Roxy, I mean, Roxy itself became a mark. Yes, Your Honor. A standalone mark as opposed to a companion mark, if you will, with Quicksilver. Right, Your Honor, and there's really three alternative grounds, and they were alternative grounds for the district court's ruling. First, that Roxy was used as a standalone, separate and apart from Quicksilver. Before Kempsta's first use, which admittedly was at least no earlier than mid-January of 92 and perhaps later. It was undisputed, and this is supplemental excerpts of the record number 71, and a picture paints a thousand words. These are the graffiti shorts. This is a rear view, which is the typical view when people are wearing these shorts, I must say. And it is Roxy on the back. It is not Quicksilver Roxy. It is Roxy. It is undisputed.  Yes. I wish I could offer a better view. Over here, it says liver. It's the end of the Quicksilver. But the Roxy is on the right rear patch on its own in a different font, different style. You don't only look at one cheek, you look at both. But even if you look at both, Your Honor, you're not seeing Quicksilver Roxy, and it's not a composite mark. And Ms. Williams didn't say it was, and even if she did, that doesn't create an issue of fact. Why not? If she's the person who was in charge of designing this campaign and implementing the Roxy mark, if she says, I knew it couldn't stand alone, I knew people had to pair it with Quicksilver for it to have any significance, why wouldn't that raise a question of fact? Because the question is how it was used, not so much what was in one person's mind as to what their intent was, Your Honor. And in addition, her testimony wasn't as characterized by Kemp's. I have it here. It's in Excerpt of Record 79 at page 1632. First she's asked about the vest. This is Supplemental Excerpt of Record 70. This also was sold before Kemp's had started using Roxyware. This vest was sold at the end of 1991, undisputed. Ms. Williams, Ms. Dodd, testified herself. On the patch, it says Roxy. In lower font, hardly visible, probably not visible from Your Honors, 20 feet away from me, there's also Quicksilver. From a distance, it's Roxy, not Quicksilver Roxy. There's no way you can argue this is Quicksilver Roxy. Roxy comes first, and indeed you can't even see Quicksilver unless you come right up and look at it. But if somebody's buying that, they're not going to hold it way up there. They're going to be looking at it pretty close. They are, Your Honor, and it says Roxy Quicksilver. It does not say Quicksilver Roxy. There's no way one can argue or make a finding that this vest used a composite mark of Quicksilver Roxy. Does it matter what order the words are in in terms of whether it's a composite? Ultimately, well, yes, it does, Your Honor. They have to be used as a composite mark in that order. Does it matter whether Quicksilver comes first or Roxy comes first if it's a composite? No, Your Honor, it would matter, because the composite mark means that it's in a particular order, and it is always in that order. What case authority are you relying upon to support your argument that a composite mark requires a particular order of the words? The case authority is the case authority, Your Honor, that deals with the notion of independent trademark significance. Give me a specific case. The Bose case, Bose, B-O-S-E, which has been cited, and the Textron case as well, which has been cited. So you say those cases say that the words must appear in a specific order? No. What they say, Your Honor, is that the focus in determining whether there's independent trademark significance is how the words are used, and whether the second word, which is here Roxy, which is what we're talking about, whether that adds independent trademark significance to the word, in this case, Quicksilver. That was the second ground for the district court. Again, the first ground was they used Roxy as a standalone, assuming the district court was correct in making that finding, and the graffiti shorts alone support that determination. Kempsta didn't overcome its burden to overcome the presumption of first use. Well, now, what's the standard of review on that? What was the burden for Kempsta? Because Quicksilver has trademark registrations, valid trademark registrations for Roxy, there's a presumption that Quicksilver is the owner, and a presumption that Quicksilver was first user of that particular mark. Now we're reviewing a 50A, the grant of a 50A motion. So aren't we supposed to construe the evidence in the light most favorable to Kempsta? Yes, Your Honor, and Kempsta had the burden to introduce legally sufficient evidence that would support a finding that it overcame the presumption that Quicksilver first used Roxy before Kempsta first used Roxyware. And in light of the uncontradicted evidence that Quicksilver used Roxy as a standalone before Kempsta first used Roxyware, then there would be no basis for a contrary finding. Why isn't it a question of fact whether this Quicksilver on one side and Roxy on the other, whether that's a standalone or whether it's a combined mark? Because the facts themselves aren't disputed, Your Honor. It's simply the conclusion that's reached from the facts. And there's no basis for a finding that this isn't a standalone. It is what it is. And so the issue is what's the issue? But they say it's one thing, Quicksilver, Roxy, one on one side, one on the other. And you read them together. And you say it's standalone. Both say it is what it is. Calling black white doesn't make it white. And that's the same issue here, Your Honor. Well, take that tag. Right. Quicksilver, Roxy. Now, is there something inherent in law or life that says those are two separate things not to be read together? No. Well, can't a jury decide that question, whether they are, in fact, independent or whether a customer reads them together as one thing? Your Honor, with respect to the this was the poster that was used in the first season that started to be sold in 1990, in the fall of 1990. I was looking at it as if that were also the tag. And it was also the hang tag that was used as well. Correct. But the poster was also displayed in retail stores and whatnot along with the hang tag. So it's part of the mix of the way these products were sold. The issue on the hang tag that's been called the Bali woman is whether Roxy is used on that hang tag has independent trademark significance. And the evidence is undisputed as to how the placement was. Quicksilver is on the left. Roxy is on the right. Right. We can all look and see that thing. And somebody could look at it and say, whenever I see that. Right. To me, that means Quicksilver Roxy. It's a concept to me. Quicksilver Roxy. Somebody else can look at it and say, oh, I think of that as Roxy. Right. Now, why is it that a jury shouldn't decide how the public views it? That wasn't the only use that was made, Your Honor. In 1991, in the fall, Quicksilver also adopted a new hang tag for its Roxy line. Here was the hang tag from the first season. Here's the hang tag from the second season. I believe this is Excerpt of Record 68. And at that point in time, again, you have Quicksilver and Roxy. Roxy in a different font. Spelled out so it's more visible to the eye. Separate and distinct from Quicksilver. Now, when was that used? When was that used, those hang tags? When were they used? They were used in the fall, starting in the fall of 1991. Okay, but isn't there a question of fact about that? Because didn't Ms. Dodd say that those posters were not used during her employment? Are these posters or hang tags? This is a hang tag, Your Honor. A hang tag. And Ms. Williams admitted, Ms. Dodd admitted that the hang tag on the right, which was part of Excerpt of Record 68, was attached to all of the Roxy products that were sold starting in the fall of 1991. So no dispute. There was a poster, though, that I think you try to rely on, and Williams says it wasn't used until after she left, and she left in February of 92. That is true. That's the poster. So you agree that there's a dispute of fact about that poster? About one poster. But we're not relying upon that poster at all, and it's not one of the posters I have up here. It's a separate issue and not something that we're relying on to show that there was first use before chemistry first use. So, again, the key here is separate and distinct in terms of how it's displayed, the manner it's displayed, the significance attached to it. Now, one other bit of visual evidence. So, counsel, are you saying that we should look at the hang tags and just intuitively from the hang tags determine that it was not a composite mark? No. I'm not, Your Honor. It's a good question. It's not a great question. I saw the reaction when counsel said great question, so I was trying to be respectful and complimentary without going over the line. I don't know if I succeeded at that or not, but that was my intent. Because it was a good question. This poster was used in the fall of 91. It was displayed with the products. It was displayed at the trade shows. It was given to the retailers who displayed it in the stores. So it qualifies under the Lanham Act as a use of the mark in connection with the sale of these products. Here it's Roxy Quicksilver. It's not Quicksilver Roxy. I don't know, Judge Rawlinson, if you can see that. I can see it. I just don't know why it matters whether it's Quicksilver Roxy or Roxy Quicksilver. What the evidence showed, and it was uncontradicted, is that Quicksilver used the Roxy name in a number of different respects prior to Kemp's first use. Sometimes it used it before Quicksilver. Sometimes it used it after. Sometimes it used it to the side. It did it in a way to make a distinction between Roxy and Quicksilver. That's the first point. Now, to answer your question, the evidence was uncontradicted that Roxy is what gave this line meaning. Quicksilver was a guy's brand. It was guy's stuff. Quicksilver never sold Junior's products under the Quicksilver name. I would agree with you if Quicksilver came out with Roxy, no Quicksilver attached to it. This would be an easy case. Absolutely. But that's not what happened, and that's what complicates the matter, is that Quicksilver is somewhere lurking there all the time, and that's what raises a question in my mind. And there's no question but that Quicksilver did that, just like Levi's, when it came out with Dockers, used the Levi's house name, just like Cadillac, when it came out with the Escalade, used Cadillac Escalade for some period of time, just like Apple, when it came out with iPod, used Apple iPod for some period of time. But what gave the line significance in those examples and in our case was Roxy. It was the name that differentiated what this product actually was. That doesn't happen instantaneously. That's why you couple it with the house mark. So that's the difficult thing is at what point does Roxy become significant in and of itself. And the issue there is critical. It's not famous. It's independent trademark significance, and the evidence was undisputed. Again, Kempsta presented nothing to the contrary. They cite, in this case, again, Williams' testimony as to what she intended, but the evidence is there were newspaper articles in the Orange County Register and otherwise that talked about Roxy prior to Kempsta's first use. That's supplemental excerpts of record 10 and 29. There's magazines that reference Roxy by Quicksilver. That's supplemental excerpt of record 17 and 18. In other words, the evidence was undisputed that what gave this line its meaning was not the word Quicksilver. Granted, the word Quicksilver demonstrated to the world that Quicksilver was behind the brand and that there was therefore reliability, et cetera, et cetera, just the way Cadillac's name stands for that, Apple's name stands for that, et cetera. But what gave this brand a distinctive image and identity was Roxy, and that's how it was used. So there was no evidence to the contrary that would support a different finding than that there was independent trademark significance, and therefore it was not an issue for the jury. In other words, there still has to be disputed issues of fact. There has to be factual matter in dispute to make it a jury question. In any case, on any issue, just saying it's a question of fact doesn't make it so. There has to be evidence introduced that would support a contrary finding, and there was no evidence introduced that would support a contrary finding. There was no evidence submitted by Kempsta, survey evidence or otherwise. There was no evidence of what consumers thought or didn't think, that this wasn't independent. The testimony from the retail side, from Lori Kisner, who was the trade show rep, and from Rick Banta, who was one of the sales reps, was that people knew the line as Roxy. The papers reported it as Roxy, and that's what gave it its distinctive image as well. Could you address the inherently distinctive question, specifically what you think of your opponent's method of distinguishing a lane, and also whether, well, let's start with that. That's also a good question. I was just turning to that page as you were asking that question. Because there is a valid trademark registration, and the only challenge that Kempsta makes to the validity of the registration is fraud, and there's no bark to that argument. They have to show that Mr. McKnight and Quicksilver intentionally concealed information, and the declaration, which is excerpt of Record 36, what Mr. McKnight signed, said that he wasn't aware of any mark that had superior rights that would be likely, when used in connection with the goods of such other person, to cause confusion. That's the representation. Evidence is undisputed that no one at Quicksilver thought these goods were confusing until much later, long after the trademark registration was submitted. Moreover, the trademark office knew about Kempsta, because Kempsta wrote a letter saying, hey, what about us? We're using this. Don't register it. And they went ahead and did it. So the supposedly concealed information was fully known by the trademark office. So there's no fraud. We have a trademark registration. It creates a presumption of inherent distinctiveness, because the trademark office didn't require a showing of secondary meaning. Counsel, those newspaper articles you were referencing that talked about Roxy, what were the dates of those articles? The ones I mentioned, Your Honor, were in 1990 and 1991. I can give you them specifically. The Orange County Register article. No mention of Quicksilver? It mentioned Quicksilver, but it mentioned the line as Roxy. Quicksilver was launching its Roxy line. This Orange County Register article, September 20, 1990, 1990 was a supplemental excerpt of Record 17. Then there was a November 91 Orange County Register ad or article, not an ad, an article, which was supplemental excerpts of Record 18. And what about the testimony from Quock that Quicksilver did no consumer advertising for the Roxy brand through October 31, 1992? How does that affect your argument? It doesn't, again, Your Honor, because we don't have to show that the mark was famous before Kemps first started using, only that it had been used and had independent significance before that point in time. And advertising is not required in order to show that. But that's what a lot of the cases talk about advertising in terms of establishing a standalone significance, don't they? It can be relevant, certainly how one advertises, but it's not essential to a finding that there is independent significance because there's other ways one can promote its mark, like posters, hang tags, the types of advertisements, the editorial advertisements that ran in the other magazines, Rolling Stone, Surfing Magazine, all of which predated Kemps's. But on the name, to get back to Judge Wilkins' question, Kemps has to present legally sufficient evidence to overcome the presumption. And by that, they have to show that it's a primarily, it's perceived by consumers to primarily be a personal name. Kemps offered no evidence to that effect, none at all. Didn't even try. Would you argue that they would have to, as a matter of law, have a consumer survey asking people what they think of Roxy? If the name was Mary, would you have to have evidence that the public thinks of Mary as a woman's name? Not necessarily, Your Honor. Roxy is just odd enough that therefore you do? Yeah, and here's what the evidence was. Again, they relied on Mr. Kwok's testimony. And this is in the excerpts of record at 1345. What Mr. Kwok said was not we picked Roxy because it was a girl's name. It was, you know, first I wanted to pick a guy's name, like Sam or George, but, you know, that it was irreverent. Teenagers like irreverent things. But Roxy to me felt real like, gosh, it sounds like a girl. But when I go to the Roxy Theater, I was like, is it a girl's name or is it Roxy, like rock and roll or what is it? It has different images. Roxy is not just a personal name. It's not just a first name. It has other meanings and other uses. And it was Kemp's burden to show that consumers primarily perceived it. What do you say the other names are? It was used as a name on the Roxy Theater before there was rock and roll. Right. And then it was used on another nightclub. The Roxy Club. Right. But that's not in any way inconsistent with a girl's name. What are the other meanings of Roxy? Well, it doesn't necessarily have to have a meaning, Your Honor. It's not as if you look in the dictionary. It has to have an impression. And there was no evidence that people would view Roxy primarily as a personal name for the Roxy line by Quicksilver or otherwise. For example, it's not Roxy's, you know, Y apostrophe S. It's not Roxy and Jill. It's not Roxy Company. It's Roxy. But if it were Jill, as Judge Wilkins said, Right. Would that be different? I still don't think that in this case, Kempstead had presented evidence to make it a fact issue because it was their burden to present some evidence to show how consumers viewed the name. So I don't think they would get there even under that circumstance, Your Honor. But here, since Roxy is not just a personal name, it has other impressions that had been used historically. Therefore, they had to present some evidence to show that it was primarily viewed by consumers as a personal name, which they didn't do. They didn't offer any evidence along those lines at all. So because of that, you don't even have to get to tacking. Again, tacking was an alternative ground for the court. If Roxy is used as a standalone or if it's used as a product mark before Kempstead first used, then that would be sufficient to justify the court making the ruling that it did under Rule 50A. Let me address. Okay. We're three minutes over. I'll give you a brief minute or less. Let me. Thank you very much, Your Honor. I appreciate that. Let me just close by saying that what the district court did here was not to try to stifle, not to allow a large company to stifle a smaller one. Quicksilver was small when it started Roxy. Roxy was small. Quicksilver invested millions and millions of dollars to make this mark into what it is. What the district court did in its final judgment, it allows Kempstead to continue to use its mark in its present and current fashion. Everything that the district court said Kempstead can't do, Kempstead has never done. It's never used its mark as a brand name. It's never imprinted it on the fabric. It's never used it in a way that was visible other than on the interior label. For the five years before trial, you could only see it by turning the label over. You could only see Roxyware by looking at the label on the shirt and turning it over to see it. That's the only way you could do it. Kempstead always used an identifier. Their mark was always Roxyware by Rox, or Roxyware by Roxanne Heppner, or Roxyware by Rox with these Think Happy characters. They kept changing their mark over the years, and yet they're criticizing Quicksilver for doing that as well. The point is that what the district court did is say, look it, Quicksilver should be allowed to continue to use its mark without restriction. Any other result would turn trademark law on its head. It would create confusion, and it would strip someone who's invested in the mark of their valuable rights. Those are the two key prongs of trademark law. Second, we're going to let Kempstead do what it's been doing because Quicksilver, you waited too long to stop them, and that was fine too. We never argued otherwise. We didn't argue at trial that Kempstead should be enjoined from doing what they were doing. We said that's fine. They should be. We agree with that. But what the district court did is going through the laches factors, said, look it, if I let Kempstead license to Kmart or license to Walmart or turn this into a brand, there's going to be significant consumer confusion. That's the primary target of trademark law, and I'm not going to let that happen. Counsel, could you briefly address the copyright and trade dress portions of the injunction? Sure. That has to do with the injunctions provision that says you can't make knockoffs. And on that, it wasn't based on trade dress and it wasn't based on copyright. It was based on trademark. The district court's concern was that if Kempstead used a product or made a product that was confusingly similar in the form of a knockoff, it would create trademark confusion. Now, what case authority supports an injunction, a provision, an injunction prohibiting knockoffs under a trademark theory?  What I would say, though, is that the scope of the injunction was a question for the court's discretion. And the standard on review is abuse of discretion, and the issue is whether there was any reasonable basis. And I would submit that the district court had a reasonable basis for imposing that restriction, as well as the others, in that if Kempstead did create a knockoff using the Roxyware mark, that would create a high likelihood of consumer confusion over the mark. That wasn't part of the complaint. That wasn't part of the proof. How can it be incorporated into an injunction if it was not raised in the complaint and not litigated by the parties at all? Your Honor, I will agree that the knockoff prohibition, unlike all the other prohibitions, wasn't the subject of evidence at trial in terms of what Kempstead was doing and not doing. Evidence was crystal clear at trial. They weren't doing these other things at all. But it was briefed. I mean, when we were going through the issue of what the form of judgment should look like, both parties submitted their proposals, and they did brief the issue before the court issued the final judgment. Briefed the issue of knockoff? It was raised in the proposed form of judgment. I believe it was, Your Honor. I believe Kempstead objected to that provision being part of the final judgment, and then ultimately the district court issued the final judgment in the form in which it appears. What were the arguments in the briefs on that issue? I believe our arguments were as they are now, Your Honor, that basically we weren't so much arguing that there's a copyright violation, but that there was an issue of trademark confusion. I think Kempstead, as I recall, made the same arguments in their opposition to the form of judgment than they make now. Thank you, counsel. Thank you very much, Your Honor. We'll give you five minutes for your question. Thank you, Your Honor. Sorry to get around this courtroom with all these posters here. Let me just make a few points. First of all, Your Honor, on the questions of the short and graffiti vest which Quicksilver's counsel showed you, I think there's a clear fact question that should have been decided by the jury about whether or not that was a composite use of the Quicksilver Roxy mark or Roxy Quicksilver, whatever the composite mark was, or whether or not that was a stand-alone mark. There was conflicting testimony on that. Ms. Dodd testified that she designed those products. She's the one who created them, and her testimony was that it was a use of the composite mark. Take, for example, if you've got someone who has a phrase as a mark, like Chanel number five, for example, and you make a T-shirt or some type of clothing and you put the Chanel on one part of the clothing and the number five on another part of the clothing, or you take a designer name like Tommy Hilfiger and you take the Tommy on one part of the clothing and you put the Hilfiger on another part of the clothing on opposite sides of the T-shirt. Does that create some separate stand-alone use of the mark? In most cases, it would be the composite mark that is used by that company. And we think that's no different here, where the Quicksilver Roxy, yes, they're separated on the short, but that they both appear on the short, and Ms. Dodd testified as to her intent on having them both appear on the short to be the composite mark. At the very least, that was a jury question to decide. The court had asked Quicksilver's counsel about whether there was any authority requiring that the composite mark must be used in a certain order, and there isn't such authority. The Bose and Hexron cases do not address that question. In the analogous case where there is a difference in the order and the court said that doesn't make any difference? Your Honor, what we think happened in this case is Quicksilver just couldn't decide in the beginning when it started its junior's life. Is there a case? I'm sorry? The question Judge Wilkins asked, is there a case? Your Honor. What's your position on this? Not what happened factually. Your Honor, none of the cases that deal with composite marks really address the question of the order of the marks that in which they have to appear. In our opinion, what happened is Quicksilver really couldn't decide which the composite mark was. Sometimes it used Roxy Quicksilver. Sometimes it used Quicksilver Roxy. It ultimately only registered Quicksilver Roxy, and today it doesn't appear that it uses the phrase with Roxy first, Roxy Quicksilver. But either way, it was a composite mark, whether it was Quicksilver Roxy or Roxy Quicksilver. Third, Your Honor, Ms. Dodd or, excuse me, Mr. Yoder explained the situation with composite marks happening all the time, such as Levi's Dockers, Cadillac Escalade, and the second term, the new product being introduced, has some trademark significance. That is true at a certain point in time when there's been sufficient exposure, advertising, and impressions in the consumer mind to affiliate the iPod, for example, with Apple. So that iPod becomes the identifier of the source of origin. But when it's first introduced, it's hard to say that that's the case, and that's the same situation here with Quicksilver Roxy or Roxy Quicksilver. When first introduced, the testimony showed that the identifier of the source of the product was Quicksilver. That's the whole reason the Quicksilver company used Quicksilver with Roxy. All of the witnesses admitted that. And so Roxy, when first introduced, could not have been the identifier of the source of origin, which is the whole point of trademark law, identifying the source of product. And certainly, it could not have gained that significance before Kimsta entered the market just a year after this Junior's line from Quicksilver started. Fourth, Your Honor, Mr. Yoder argued that the evidence is undisputed that Roxy is what gave meaning to the phrase Quicksilver Roxy or Roxy Quicksilver. We completely disagree. In fact, the evidence showed from testimony from Quicksilver's witnesses, as well as Ms. Dodd, that the whole reason there was a composite mark is because Quicksilver is what gave meaning to the phrase, not Roxy, because no one would have known who Roxy was. Mr. Yoder also argues that Kimsta is only raising one ground of attack to the validity of the trademark registrations that Quicksilver owns. That's not true, at least as to the Roxy registration. Kimsta is arguing that it is a first user and it used its Roxyware mark before Quicksilver introduced Roxy as a stand-alone mark. And therefore, that is another method of attack against the trademark registration. At the bottom line, Your Honor, we believe there is a clear jury question here. In fact, there are multiple jury questions. There was conflicting evidence between the testimony. It all comes down to Quicksilver witnesses against Ms. Dodd, the very person who designed and created all of these products, the hang tags that we've seen today. She testified as to her intent. Her intent is highly relevant, and it should have been something that the jury should have considered. For those reasons, we believe that the judgment should be reversed. Thank you, counsel. Your Honor, I did have five different answers provided in response to the question. Yes. If you could just give them to the clerk and thank you. Thank you.
judges: Reinhardt, Rawlinson, Wilken